851 So.2d 103 (2001)
Jerry T. FITCH, Sr.
v.
STATE.
CR-97-2284.
Court of Criminal Appeals of Alabama.
August 31, 2001.
Rehearing Denied December 14, 2001.
*110 William J. Baxley and David McKnight, Birmingham, for appellant.
William H. Pryor, Jr., atty. gen., and Stephanie N. Morman, asst. atty. gen., for appellee.
COBB, Judge.
Jerry T. Fitch, Sr., appeals his January 17, 1998, convictions arising from three separate indictments charging six counts of using his public office for personal gain, one count of aiding and abetting another in using his public position for personal gain, and two counts of first-degree theft.[1]
The array of ethics charges focused on the actions of three people: Jerry T. Fitch, Sr., the appellant; Jerry T. Fitch, Jr., the appellant's son; and Harry Gene Edwards, the appellant's employee and business partner. During the calendar years 1994 and 1995, the appellant, Jerry T. Fitch, Sr. (hereinafter "Fitch"), was an elected official serving as county commissioner for District 4, Pickens County.[2] Jerry T. Fitch, Jr., also known as Bubba Fitch (hereinafter "Bubba"), is Fitch's son. Harry Gene Edwards (hereinafter "Edwards") was employed by Pickens County Commission, District 4, as a foreman during 1994 and 1995. In addition to their work for the county commission, Edwards *111 and Fitch were equal partners in a small construction company, E & F and Sons. The company's only employees were Fitch, Edwards, Bubba, who worked as a machine operator, and Fitch's wife, who was bookkeeper. Fitch's home address was also the company's address.
During this period, Pickens County operated a sanitary landfill that was ordered to be closed by the Alabama Department of Environmental Management (hereinafter "ADEM"). The closing of the landfill resulted in Fitch's being convicted of violating § 36-25-5(a), Ala.Code 1975, of the "Code of Ethics For Public Officials, Employees, etc." which prohibits a public official from using a public position to obtain direct personal financial gain for himself, his family, or his business. Fitch was also convicted of aiding and abetting Harry Edwards, also a public employee, in using his public position to obtain direct personal financial gain, and Fitch was convicted of theft of County funds, a violation of § 13A-8-3, Ala.Code 1975. Fitch has raised 11 issues on appeal.

Facts
In 1994 Pickens County was operating a sanitary landfill. During this time the Environmental Protection Agency (hereinafter the "EPA") passed new federal regulations, 40 C.F.R. § 258, Subtitle D of the Resource Conservation and Recovery Act for Municipal Solid Waste Landfills, called "Subtitle D Regulations," governing sanitary landfills. Essentially, the EPA required that before October 9, 1994, a sanitary landfill operate under the newly imposed regulations or be closed. R. 1096. The Pickens County Commission decided that the landfill had to be closed because Pickens County could not afford the "significant financial burden" that accompanied compliance with the new regulations. R. 1096. However, failure to close the landfill in compliance with ADEM regulations by October 9, 1994, would result in the imposition of substantial fines against Pickens County. A fine of up to $ 25,000 per day$175,000 per weekcould be imposed for noncompliance. R. 1098.
In the summer of 1994 the county commission began advertising for contractors to submit bids to close the landfill. However, in an effort to save money and expedite closing the landfill, the county commission discussed alternative ways of accomplishing the work necessary to close the landfill. William Latham, chairman of the county commission at the time, testified that one suggestion discussed by the commission was to have county workers do any work they were qualified to do at the landfill in order to save money. Latham stated that Fitch took a negative approach to this idea. According to Latham, Fitch said that he was not going to let his foreman, Edwards, "be tied up out there." R. 877.
On July 26, 1994, the county commission opened the bids submitted from contractors seeking the job of closing the landfill. Fitch made a motion to award the contact for closing the landfill to the lowest bidder, RaCon, Incorporated, whose bid was $650,000. However, on August 23, 1994, the commissioners discovered that an error had been made in calculating the amount of dirt that had to be moved to cover the landfill. This error voided the July 26, 1994, contract awarded to RaCon, and required that bids for closing the landfill be resubmitted after consideration of the accurate information.
Steven E. Koehn, owner of Progressive Earthmovers, an earth-moving business in Aberdeen, Mississippi, testified that at some point in July 1994 Tony Edwards Harry Edwards's brotherasked if he was interested in obtaining the job of moving the dirt required to close the landfill. At *112 the time of their conversation, Tony and Harry Edwards were trying to form Eupora Contractors, Incorporated, to submit a bid on the landfill project. Thus, there was evidence indicating that as early as July, Edwards was planning to take leave from his county job in order to work at the landfill; this could be accomplished only with Fitch's approval. According to Koehn, at some point in July 1994,[3] Koehn met with Tony Edwards, Edwards, and Fitch at the landfill. At this time Fitch showed Koehn the specifications for closing the landfill. R. 974. Koehn determined that he could move the dirt required to close the landfill for $133,000. However, Koehn stated that at some point after the meeting, Tony Edwards telephoned him and said the job was off because of some problem with obtaining the contract. Koehn testified that either Harry or Tony Edwards later telephoned and said the job was on again. R. 947. However, Koehn stated that he believed that it was Edwards who had informed him that Gates Construction Company, not Eupora, was the contractor for the project.[4] R. 957.
Despite Fitch's assertion that he would not allow one of his employees to work for the County on the landfill closure, on August 29, 1994, Fitch, as commissioner for District 4, authorized Edwards's leave of absence to work on the landfill for Eupora.[5] Had Edwards been closing the landfill as a County employee, his salary during September and October 1994 would have been $7.75 per hour.[6] R. 505. As an independent subcontractor, Edwards's profit for his services for closing the landfill was $126,000 (R. 1130).
On September 1, 1994, two days after Fitch approved Edwards's leave of absence from his County job to work on the landfill, the resubmitted bids were opened and Eupora Contractors' bid was the lowest at $314,500. A motion to award the contract to Eupora carried. Fitch abstained from this vote.
Latham testified that after the second bidding process, but before any work had begun at the landfill, Fitch expressed an interest in getting the landfill contract himself. R. 878-79. According to Latham, Fitch said, "`I wish that I wasn't involved,' that he would like to have the contract." R. 880.
On September 6, 1994, the county commission met. It was revealed that Eupora Contractors was not eligible to work on the landfill because it did not have an Alabama State contractor's license. Pickens County administrator Keith Powell informed the commission that the Ala.Code 1975, § 11-3-9, allowed the commission to negotiate with any bidder since RaCon had submitted the only eligible bid. At this time, Commissioner Leon Morris made a motion, seconded by Fitch, to accept a bid from Gates Construction Company, owned by Ken Gates, for $324,000.[7] All commissioners voted to accept Gates's bid. However, it was discovered that Gates was licensed only as an Alabama general contractor, *113 i.e., a building contractor; he was not licensed to perform the work necessary to close the landfilli.e., paving, grating, moving dirt, and water drainage.
At some point in June 1994, Fitch asked Horace Ray Gore, the owner of Perma Corporation, Incorporated, a construction company, if he was interested in bidding on the landfill closure. Gore stated that he was not interested because he did not have a supervisor for the project. R. 515. Gore testified that at some point after his June 1994 conversation with Fitch, Ken Gates went to Gore's office and asked Gore to submit a bid for the contract, then subcontract the entire job to Gates Construction. Gates came to Gore because Gates was licensed only as a general contractor in Alabama. Gore told Gates that Gore would have to review the bid Gates had submitted and make sure Gates Construction could do the work at the bid price because Gates's bid was $100,000 less than other bids. Gore stated that from looking at the numbers there did not appear to be much of a profit margin in Gates's bid proposal. In fact, Gore stated that Gates's bid proposal was "a good price for the county." R. 556. After review, Gore found Gates's bid to be acceptable. Out of abundance of caution, Gore telephoned the licensing board in Montgomery to make sure that it was acceptable for Perma Corporation to acquire the job closing the landfill and then to subcontract the entire job to Gates Construction. Gore wanted assurance that he could subcontract the work to Gates Construction, because Gates Construction did not have a license to do dirt work. R. 549. Gore was also told by an official with the county commission that the County had confirmed with the attorney general's office that Perma Corporation's subcontracting the entire job to Gates Construction was legal and was a proper business transaction. R. 543. Thus, the commissioners knew before awarding the contract to Perma Corporation that Perma Corporation planned to subcontract the job of closing the landfill to Gates Construction Company.
Gore agreed to subcontract the entire job to Gates Construction in return for a small percentage of the cost. Gore's agreement with Gates was that Gates Construction would do all the work and Perma Corporation was to do only the paperwork for the project.
Gore stated that he sent to the commission a bid for the contract to close the landfill. David Howell, audit manager with the Alabama Department of Examiners of Public Accounts, investigated the allegations against Fitch and testified that all the commissioners he spoke to, including Fitch, knew before accepting Perma Corporation's bid that Gore was going to subcontract the entire landfill closure to Gates Construction. R. 782-83. Moreover, Fitch had known Ken Gates for many years, and E & F and Sons, Fitch's company, had worked with Gates Construction on several small construction projects.
On September 13, 1994, Commissioner Morris made a motion, seconded by Commissioner James, to award the landfill closure to Gore's company, Perma Corporation, for $333,500. All commissioners voted affirmatively.[8] Gore stated that the commission sent him a letter accepting the bid "and just told me to go to work." *114 R. 520. Gore explained that there was no formal contract signed between Perma Corporation and Pickens County. According to Gore, he was told by the county commission to notify his subcontractors and to proceed with the work of closing the landfill. R. 515.
Lawrence Doughty, county engineer in Pickens County, testified that at some point after work had begun on the landfill closure, he was at the landfill when Commissioner Latham and Fitch were there. Latham commented that "it didn't look like there was enough dirt there and some comments about their equipment." R. 933. According to Doughty, after Latham left, Fitch commented that "[Latham] was just mad because [Fitch] had friends that could get things done." R. 934.
Other testimony presented at Fitch's trial tending to personally connect Fitch with the project included the following: John Hopson Skelton, Jr., a Pickens County employee assigned to work in the landfill office before its closure, testified that he saw Fitch working at the landfill, using his own farm tractor to disk the fertilizer and lime into the ground. R. 894. Skelton also saw Fitch appearing to attempt to repair what Skelton said was a piece of equipment called a road-grader that belonged to either Fitch or Bubba and that was being used to do work at the landfill closure. R. 896. Sammie Earl Jones testified that he worked with Edwards and Bubba closing the landfill. He stated that one day Fitch came to the landfill with a piece of equipment called a "low-boy." According to Jones, Fitch and Edwards loaded a bulldozer that Edwards had been using at the landfill onto the low-boy and that Fitch drove away with the dozer. R. 902. Rolston Oglesby worked at the landfill before its closure. He testified that he saw a piece of equipment that belonged to Pickens County, called a sheep-footed roller, being used by workers closing the landfill. R. 914-15.
Robert Thompson, a certified public accountant, prepared Fitch's, Bubba's, and Edwards's Federal income tax returns for 1994. The tax returns reflected that Fitch took a depreciation deduction for a hay baler, valued at $14,815. Bubba paid the bank loan used to purchase this baler out of a $30,000 payment Bubba received from Edwards for working at the landfill. Fitch reported as "other income" income generated from equipment rental. Bubba's tax return also reflected as "other income" income generated from equipment rental. Edwards's tax returns reflected that he had paid Fitch $33,235 for "rents" and that he had paid Bubba $30,000 for "rents." Edwards rented equipment from Fitch and Bubba to close the landfill.
Karen Seymer, a teller at the First National Bank of Cental Alabama, Carrollton Branch, testified that on October 3, 1994, the banks "daily chart for cash transactions $3000.00 and over" (R. 1018), a document generated daily by the bank to document cash payments over $3,000, shows the signature of Jerry T. Fitch, Jr., acknowledging the submission of a single check, the proceeds from which were to be applied to the payment of two loans (loans 332511 and 332311), and the receipt of $8964.94 cash. However, the bank requires that when a customer receives cash in an amount over $3000, the recipient provide a driver's license for identification purposes. The "daily chart for cash transactions $3000.00 and over" reflects the identification of the recipient of the $8964.94 cash to be Fitch.
The Pickens County Commission made four payments to Perma Corporation for closing the landfill. Fitch's convictions arose from three of these payments. The first payment was made on September 28, 1994, in the amount of $134,400. From *115 this sum, Perma Corporation paid Gates Construction $126,400. From this sum, Gates paid Edwards $66,400. From this sum, Edwards paid Bubba $30,000.[9] Bubba's receipt of this $30,000 payment underlies Fitch's conviction on Count two in case CC-97-0155.[10] From this $30,000, Bubba made a $15,035.06 payment on a loan for a hay baler. Fitch, who had cosigned this loan with Bubba, was ultimately liable to the bank for payment of this loan. This $15,035.06 underlies Fitch's conviction in Count one of case no. CC-97-0282.[11] Also from this $30,000, Bubba paid $6,000 on a loan used to obtain a John Deere brand tractor. Fitch, who cosigned on this loan with Bubba, was liable to the bank for payment of this loan. This $6,000 underlies Fitch's conviction for Count two in case no. CC-97-0282.[12]
The second payment to Perma Corporation was made on October 14, 1994, in the amount of $144,675.60. From this sum Perma Corporation paid Gates Construction $136,175.60. Gates paid Edwards $66,475.60. Edwards paid Bubba $33,235. This payment to Bubba underlies Fitch's conviction for Count three in case no. CC-97-0155.[13] From this $33,235, $25,000 was deposited into Fitch's personal bank account. This underlies Fitch's conviction for Count one in case no. CC-97-0164.[14]
*116 The third payment, in an amount of $36,000 was made to Perma Corporation on November 29, 1994. No charges arose from this payment.
The final payment to Perma Corporation was made on January 10, 1995, in the amount of $31,008.40. This entire amount was paid to Gates Construction. From this $31,008.40, Gates paid Edwards $17,708.40. From this $17,708.40, Bubba was paid $8,546.63. This $8,546.63 received by Bubba underlies Fitch's conviction of Count four in case no. CC-97-0155.[15]
The following issues are raised on appeal.

I.
Fitch contends that the trial court committed reversible error by allowing, over defense objection, prosecution witnesses Hugh Raymond Evans III, assistant director and general counsel for the Alabama Ethics Commission, and David Howell, audit manager with the State Department of Examiners of Public Accounts, to give their opinions as to the ultimate issue in the case, contrary to Rule 704, Ala.R.Evid.
Rule 704, Ala.R.Evid., states: "Testimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact."
"An ultimate issue has been defined as the last question that must be determined by the jury." Tims v. State, 711 So.2d 1118, 1125 (Ala.Crim.App.1997).

I-A.
Evans testified that he is an attorney and that since 1995 he has served as assistant director and general counsel for the Ethics Commission. His job responsibilities included reviewing and analyzing complaints, prosecuting ethics violations, and writing advisory opinions. Evans was familiar with § 36-25-5(a), Ala.Code 1975, the statute which Fitch is accused of violating.[16] In 1994, § 36-25-5(a) stated:
"No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, *117 or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law."
The following exchange is the basis of Fitch's claim that the trial court committed reversible error by allowing Evans to give his opinion as to the alleged ultimate issue in the case.
"Q. [Prosecutor] All right. If there had been competitive bids, as there has been in this situation, and the Commission was considering whether to award the contract by negotiation to lower than a competitive bid, does the Ethics Law permit a Commissioner to vote on the awarding of that contract, absent a competitive bid, after negotiation, if he has a personal interest in the contract? Can he do that?
"A. [Evans] In my opinion
"MR. BAXLEY: I object. The question isfrankly, I didn't understand it. And, also, I think ifif I do understand it, I think it calls for an opinion on the ultimate conclusion of the case.
"MR. WARD [defense counsel]: Barred by Rule 704.
"MR. BAXLEY: Barred by Rule 704.
"THE COURT: As to the elements that are charged in thisdid you understand the question?
"THE WITNESS: Yes, sir.
"THE COURT: Overruled.
"....
"Q. Can a Commissioner vote to award a contract by negotiation after a competitive bid in which the bidders have been disqualified?
"A. In my opinion, that would be a use of position for personal gain and would be a violation of the Ethics Law, yes, sir.
"Q. And it doesn't make any difference whether it's voting to award a negotiated contract or competively bid contract, does it?
"A. Regardless, they cannot be involved in the transaction. If it is bid, they can be bidder but nothing else."
R. 1044-47.
The above exchange did not constitute reversible error under Rule 704, Ala. R.Evid., because Rule 702, Ala.R.Evid., provides an exception for its admission. Rule 702, Ala.R.Evid., provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
This Court has said:
"Rule 704, Ala.R.Evid., provides that `[t]estimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.' However, in the case of expert testimony, enforcement of this rule has been lax. C. Gamble, Gamble's Alabama Rules of Evidence § 704 (1995). We have noted previously in Travis v. State, 776 So.2d 819 at 849 (Ala.Cr.App.1997), that expert testimony as to the ultimate issue should be allowed when it would aid or assist the trier of fact, and the fact that `"`a question propounded to an expert witness will elicit an opinion from him in practical affirmation or disaffirmation of a material issue in a case will not suffice to render the question improper'"' (citations omitted); see also Rule 702, Ala.R.Evid. (stating that expert testimony should be allowed when it will aid or assist the trier of fact)."
Henderson v. State, 715 So.2d 863, 864-65 (Ala.Crim.App.1997).
*118 "We recognize that through interviews, case studies, and research a person may acquire superior knowledge concerning characteristics of an offense." Simmons v. State, 797 So.2d 1134, 1155 (Ala. Crim.App.2000). Evans's testimonythat as counsel for the Ethics Commission he authored advisory opinions that applied the ethics law to fact situationswas sufficient to establish that he had a specialized knowledge of the ethics law. Here, an ultimate issue to be decided by the jury was whether Fitch's alleged direct personal financial gain was specifically authorized by law. "It seems to us that expert testimony on this subjectwhich the defense was free to contradictwas reasonably likely to assist the jury in understanding and in assessing the evidence, in that the matter at issue was highly material, and beyond the realm of `acquired' knowledge normally possessed by lay jurors." Simmons v. State, 797 So.2d at 1156-57 (homicide investigator considered an expert in crime scene analysis and victimology based on his studies and experiences in these fields). Evans's familiarity with the ethics law would have assisted the fact-finder in determining whether Fitch's conduct was authorized by law.
Moreover, if the trial court had erred in allowing this testimony, the error would have been harmless[17] for two reasons. First, Fitch was found not guilty of voting to award the contract. Thus, Fitch was not harmed by this testimony; this issue is moot. Second, the trial court gave a curative instruction regarding this testimony.
The trial court gave the jury the following curative instruction:
"THE COURT: ... I want to give you asome direction and instruction on an issue that has come up. Earlier in the trial, when I ... read the indictments in this case and you understand what the charges are. In all three of these cases, several of the counts allege that the Defendant used his official position for personal gain and that's been referred to, basically, as kind of a shorthand in this trial, as the Ethics Law because that's, basically, what it is labeled or called. So, we have done that as a shorthand.
"Now, later on when I charge you, I will talk about the elements of these cases, the elements that the State must prove beyond a reasonable doubt, and we'll get into that in much more detail later. But as to these ethics charges, I'll call them, one of the elements that must be proven is that such use and gain is not specifically authorized by law, and that must be proved to your satisfaction. Now, like I said, we'll discuss that later. And there has been evidence as to that. However, when this last witness testifiedand I don't remember the gentleman's name.
"MR. JOHNSTON: Evans.

*119 "MR. BAXLEY: Evans.
"THE COURT: He's from thea lawyer with the Ethics Board. There were some questions asked and the answers that were elicited wereand I don't remember the specificspecifically the exact words he used but they were that the allegations that were made here, if they did happen, that they were a violation of the Ethics Law. That is not for him to determine. The determination of whether these acts, as alleged, are a violation of the Ethics Law is for your determination. So, basically he has given an opinion or a verdict in the case from the witness stand. That is not his job in this case. That will be your job at the end of the case. So, I am instructing and directing you that you may not consider that witness's testimony as to whether or not these acts violated the Ethics Law. I am instructing you that. You are to disregard that.
"Now, the other evidence as to the use and gain not being specifically authorized by law, of course, you may consider that. Now, as to this direction, what I'm going to do now is direct you to put that out of your mind. And now I am going to ask you that in your deliberations in this case if you can put that out of your mind as you consider the evidence here. And I am just going to go down the line and ask each person if they can do that and you can just nod your head or shake whatever your answer is. I'll start here. Can you put that out of your mind as a juror in this case?
"(Jurors polled.)
"THE COURT: And let the record show that all jurors indicated that they could do that."
R. 1056-59 (emphasis added).[18]
"`The admission of illegal evidence, which is subsequently excluded and the jury instructed to disregard such evidence, cures the error, and vitiates the exception reserved to its admission.' Smith v. State, 107 Ala. 139, 18 So. 306 (1894). See also Smith v. State, 340 So.2d 84 (Ala.Crim. App.1976); Watson v. Adams, 187 Ala. 490, 65 So. 528 (1914)." Smith v. State, 797 So.2d 503, 535 (Ala.Crim.App.2000). Any possible error was rendered harmless by the verdict of not guilty on the voting count, and by the curative instruction given by the trial court.

I-B.
The following transpired at trial regarding the questioning of auditor David Howell.
"Q. [By Mr. McCool for the prosecution]: Well, is it part of your job to be familiar with the State laws regarding expenditures of public monies and be able to catch anything that might not be authorized by law?
"A. Yes.
"Q. I mean, that's what you do; isn't it?
"A. That's correct.
"Q. Well, based on your experience as an auditor who is trained to catch these violations of law in regard to public expenditures of public money, do you know of any provisions of law that specifically authorized Jerry Fitch, Sr., to receive *120 any of these payments of these monies that we've introduced into evidence?
"A. No, I do not.
"MR. BAXLEY [defense attorney]: Object to, number onewell, several grounds. This man is not qualified as a legal expert as to the provisions of the law that might authorize it to be done. It's outside the province of strictly auditing. It's outside of his province as an expert. Since he can't answer it because he's not qualified as an expert, it's an improper question to be asked any witness other than, possibly, a qualified legal expert. It invades the jury's province. It's argumentative.
"THE COURT: Based on the question, that's overruled. I believe he answered. Did he?
"THE WITNESS: Yes, sir.
"(By Mr. McCool [the prosecutor].)
"Q. I want to ask you, also, based on your experience
"MR. BAXLEY: Well, let him answer it.
"THE COURT: I think he did. I think he may have
"A. The answer was, I don't know of any statute authorizing it.
"MR. BAXLEY: What was the answer? I couldn't hear him.
"(By Mr. McCool.)
"Q. Say it again.
"A. I do not know of any statute that authorized him to receive those payments."
R. 763-65.
The objection was made after the answer was given. "[T]he appellant did not object until after the question had been asked and answered and did not move to exclude the witness' answer.... Therefore, he did not preserve this issue for our review." James v. State, 788 So.2d 185, 196 (Ala.Crim.App.2000).[19]
Moreover, as discussed in Part I-A, Howell's testimony was admissible because "expert testimony as to the ultimate issue should be allowed when it would aid or assist the trier of fact." Henderson v. State, 715 So.2d 863, 864 (Ala.Crim.App. 1997).

II.
Fitch contends that the trial court erred in denying his motion for a judgment of acquittal on the two charges of theft by deception, Count four of CC-97-0282 and Count two of CC-97-0164.[20] We disagree.
The trial court's ruling on a motion for a judgment of acquittal must be "reviewed "`in [a] light most favorable to the prosecution. The standard of review is whether legal evidence was presented to *121 the jury from which the jury could by fair inference find the defendant guilty beyond a reasonable doubt.'" Hale v. State, 654 So.2d 83, 85 (Ala.Crim.App.1994)(quoting Powell v. State, 576 So.2d 1285, 1288 (Ala. Crim.App.1991)). "`To prove a prima facie case in a criminal prosecution, the State must "fulfill its duty of proving the elements of the offense so that the jury may be allowed to consider its case."'" Gamble v. State, 699 So.2d 978, 979 (Ala.Crim.App.1997)(quoting Eldridge v. State, 415 So.2d 1190, 1194 (Ala.Crim.App. 1982)). Thus, "the determination of whether any evidence exists to support a conviction is a question of law, the assessment of the probative value and weight of that evidence is left solely for the jury." Lockhart v. State, 715 So.2d 895, 901 (Ala. Crim.App.1997).
Theft of property is defined in § 13A-8-2, Ala.Code 1975, as:
"A person commits the crime of theft of property if he:
"....
"(2) Knowingly obtains by deception control over the property of another, with intent to deprive the owner of his property."
Theft of property in the first degree is defined as:
"(a) The theft of property which exceeds $1,000.00 in value, or property of any value taken from the person of another, constitutes theft of property in the first degree."
Section 13A-8-3(a), Ala.Code 1975.
Deception is defined at § 13A-8-1, Ala. Code 1975:
"(1) Deception occurs when a person knowingly:
"a. Creates or confirms another's impression which is false and which the defendant does not believe to be true; or
"b. Fails to correct a false impression which the defendant previously has created or confirmed; or
"c. Fails to correct a false impression when the defendant is under a duty to do so; or
"d. Prevents another from acquiring information pertinent to the disposition of the property involved; or
"e. Sells or otherwise transfers or encumbers property, failing to disclose a lien, adverse claim or other legal impediment to the enjoyment of the property when the defendant is under a duty to do so, whether that impediment is or is not valid, or is not a matter of official record; or
"f. Promises performance which the defendant does not intend to perform or knows will not be performed. Failure to perform, standing alone, however, is not proof that the defendant did not intend to perform."
(Emphasis added.)
Fitch argues that the State failed to prove that his conduct established theft by deception, under any definition, and argued that the precedent set forth in Chandler v. State, 615 So.2d 100 (Ala. Crim.App.1992), mandated his acquittal of the theft charges. In Chandler, Chandler was convicted of two counts of theft by deception and six counts of violating the ethics law, specifically that he used his official position to obtain for himself direct personal financial gain, in violation of § 36-25-5, Ala.Code 1975. On appeal he challenged the sufficiency of the evidence to sustain his convictions for theft by deception. Chandler was the mayor of the City of Vernon, Alabama. During his tenure as mayor, he voted, at a city counsel meeting, to appropriate public funds for the City to purchase land he owned on which to build a mental health facility. *122 Chandler did not disclose to the city counsel his connection to the land.
Regarding the element of intent to deprive, this Court stated:
"However, while the appellant clearly `knowingly obtain[ed] by deception control over the property of another,' there is no evidence that the appellant intended to deprive the owner of his property. The record indicates that, in return for the $ 50,000, the appellant's property was deeded over to the Mental Health Center."
615 So.2d at 105.
Chandler is distinguishable from the present case. In Chandler the State failed to prove the element of intent to deprive the State of its property. In other words, the City benefited from a fair bargain with Chandler. There is no such inference here. In addition to evidence indicating that Fitch took certain deceptive actions to facilitate receiving county funds, there was evidence presented from which the jury could have inferred that Fitch intended to deprive the County of its funds. In this case, Fitch permitted Edwards to take a leave of absence from his county job, thereby raising the County's cost of closing the landfill by making it possible for Edwards to receive more money due to his participation in the construction project as an independent contractor. In other words, the jury could have believed that Fitch intended to deprive the County of the difference between the cost of Edwards's working to close the landfill while serving as a County employee and what Edwards received for closing the landfill as an independent contractor.
"`"`... The weight of the evidence, the credibility of the witnesses, and inferences to be drawn from the evidence, where susceptible of more than one rational conclusion, are for the jury alone.'... `It was within the province of the jury to give the evidence in the case whatever weight and emphasis they thought proper in reaching their verdict.'... `Where, ... there is conflicting evidence presented by the prosecution and the defense, it is for the jury to resolve the conflict and determine the defendant's guilt or innocence.... In making its determination, the jury may believe or disbelieve all or any part of the testimony presented by either side.'"'"
Miller v. State, 645 So.2d 363, 367-68 (Ala. Crim.App.1994) (citations omitted).
Although the jury heard testimony to the effect that the price the county had paid to close the landfill was fair, the jury also heard evidence that Edwards had overcharged the county for his work on the landfill. Steve Koehn testified that he could have done Edwards's job for $25,000. Harrison testified that a contractor's profit margin was normally 10% to 15%. Edwards received $154,000 from Gates for his work at the landfill; after expenses, his profit was approximately 50%. This testimony indicated to the jury that Edwards had overcharged the County for his work closing the landfill. It was for the jury to weigh the evidence regarding Edwards's earnings and to determine whether Edwards had intentionally overcharged the County for his work. If the jury believed there was an overcharge by Edwards, the overcharge constituted the element of intent to deprive the County of its property. From this evidence, the jury could by fair inference find Fitch guilty of theft of property beyond a reasonable doubt, because he had aided and abetted Edwards.
Although it was a close question, sufficient evidence was presented to support the denial of Fitch's motion for a judgment of acquittal. Once the case was given to the jury, it was the jury's responsibility to *123 weigh the evidence; its conclusions should not be disturbed on appeal.

III.
Fitch contends that the State used peremptory strikes to exclude jurors in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The following transpired at trial.
"MR. BAXLEY [defense counsel]: Your Honor, the Defendant would respectfully move that our client's rights have been violated under the Constitution of the United States and under the Supreme Court decision of Batson in that the State has 16 strikes and they exercised 10 of those to strike minority or black people, which is a percent greatly higher than the roughly 35% of the venire that was minority or is greatly higher than the population of the County. And, therefore, we ask that the jury be replaced with one that's more in keeping with thethat's it.
"THE COURT: All right.
"MR. McKNIGHT [defense counsel]: Judge, one additional ground, just for the record, there were 11 black males on the jury, they struck 8 of them, almost 80% of the black males.
"THE COURT: All right. How many strikes altogether did the State have?
"THE CLERK: Seventeen.
"MR. JOHNSTON: Seventeen.
"THE COURT: And they struck how many blacks?
"MR. McKNIGHT: Ten.
"THE COURT: All right.
"MR. BAXLEY: One of them is an alternate. They had 16 absolute strikes.
"THE COURT: All right. And on thehow many blacks were on the what's the black/white breakdown of the total venire?
"THE CLERK: Seventeen blacks on theout of 46.
"THE COURT: All right. And the makeup of the jury is what black/white? The jury that's going to sit on this case.
"THE CLERK: Six blacks and eight whites.
"THE COURT: All right. But now how manynot counting the alternates?
"MR. McCOOL [the prosecution]: Six blacks, six whites.
"THE COURT: Is that correct?
"THE CLERK: Right.
"THE COURT: All right. Based on the evidence before the Court, the Defendant has not made a prima facie showing. So, that motion is denied."
R. 365-67.
"`A defendant making a Batson challenge bears the burden of proving a prima facie case of purposeful or intentional discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609, 622 (Ala.1987).
"`....
"Procedurally, the party alleging racial discrimination in the use of peremptory challenges bears the burden of establishing a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). `"It is important that the defendant come forward with facts, not just numbers alone, when asking the [trial] court to find a prima facie case."' Mitchell v. State, 579 So.2d 45, 48 (Ala.Crim.App.1991), cert. denied, 596 So.2d 954 (Ala.1992), quoting United States v. Moore, 895 F.2d 484, 485 (8th Cir.1990)."
McElemore v. State, 798 So.2d 693, 695-96 (Ala.Crim.App.2000). "`A trial court's ruling *124 on a Batson objection is entitled to great deference, and we will not reverse the trial court's Batson ruling unless it is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala.1987).'" McElemore v. State, 798 So.2d at 695 (quoting Pressley v. State, 770 So.2d 143, 144 (Ala.2000)).
Fitch offered only numbers, no facts, to support his claim that the principles of Batson had been violated. The trial court correctly ruled that the evidence before the Court did not establish a prima facie showing of purposeful or intentional discrimination by the State in its implementation of peremptory strikes. Thus, the trial court correctly denied the Batson motion.

IV.
Fitch contends that he was deprived of his constitutional right to a thorough cross-examination of Hugh Raymond Evans III, assistant director and general counsel for the Alabama Ethics Commission, by the trial court's refusal to allow Fitch to introduce into evidence Advisory Opinion 97-97. The opinion was drafted by Evans for an unrelated case, and it was written after the ethics law was amended in 1995.
Fitch did not object at trial on grounds that he was being denied a thorough and sifting cross-examination by the trial court's denial to admit the ethics opinion authored by Evans into evidence. Instead, he argued only that the document was relevant to, and admissible in, this case, that he was not informed that this witness would testify, and that the trial court had refused earlier in the trial to allow Fitch to enter the opinion into evidence. "Because the grounds raised on appeal are different from those advanced at trial, this issue was not properly preserved for appellate review." Hyde v. State, 778 So.2d 199, 216 (Ala.Crim.App. 1998), aff'd, Ex parte Hyde, 778 So.2d 237 (Ala.2000). A "statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Richerson v. State, 668 So.2d 130, 133 (Ala.Crim.App.1995).
Additionally, any detriment to Fitch caused by the denial of the admission of the advisory opinion was, at most, harmless because Fitch was allowed a thorough and sifting cross-examination of Evans. See Tucker v. State, 650 So.2d 534, 538 (Ala.Crim.App.1994) (circuit court's erroneous ruling that the defense could not impeach witness with a prior conviction was harmless error because it did not injuriously affect the defendant's substantial rights); Walker v. State, 581 So.2d 570, 572 (Ala.Crim.App.1991) (although trial court erroneously disallowed accused's attempt to impeach State's witness by prior inconsistent statement, error was harmless because accused conducted a "thorough and sifting" cross-examination of witness and successfully impeached witness with another self-contradiction); Williams v. State, 451 So.2d 411, 420 (Ala. Crim.App.1984) (exclusion of evidence that would have impeached witness was harmless error when witness's credibility had already been called into question by two other pieces of evidence).
Moreover, Fitch did not show the relevancy of the evidence at trial through an offer of proof. "[A]n offer of proof is necessary before we can review a trial court's ruling on the limitation of cross-examination." Smith v. State, 795 So.2d 788, 815 (Ala.Crim.App.2000). The same is true concerning the admissibility of the advisory opinionan offer of proof was necessary to discern the relevancy of the ethics opinion Fitch sought to admit.
*125 Moreover, it is this Court's opinion that Advisory Opinion 97-97 was not relevant to Fitch's case. "Relevant evidence is defined as `evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Rule 401, Ala.R.Evid." Hutchins v. State, 822 So.2d 459, 463 (Ala.Crim.App.2000). To be relevant, the advisory opinion would have to shed light on whether Fitch used his official position, in a way not authorized by law, to obtain financial gain for himself, his business, or his family. "The Alabama State Ethics Commission regularly issues advisory opinions concerning possible violations of the Alabama Ethics Act." Kirkland v. State, 529 So.2d 1036, 1040 (Ala. Crim.App.1988). "Advisory opinions issued by the State of Alabama Ethics Commission are not law, but they may protect certain persons from liability under the Ethics Act." Alabama's Amended Ethics Law, 57 Ala. Law. 34 (1996).
"The Ethics Commission is granted the authority in Code 1975, § 36-25-4(9), to render advisory opinions. Such an opinion has the effect of protecting `such person to whom it is directed from liability to either the state, county or municipal subdivision of the state because of any official action or actions performed as directed or advised in such opinion.' § 36-25-4(9)."
Underwood v. State, 439 So.2d 125, 127 (Ala.1983)(emphasis added).
"`The written opinion of the state ethics commission provided to anyone shall protect such person to whom it is directed from liability to [the state] ... because of any official action or actions performed as directed or advised in such opinion.'"
Dill v. State, 723 So.2d 787, 803 (Ala.Crim. App.1998).
In essence, the advisory opinion is a means by which a public official provides disclosure of a proposed plan and receives an endorsement or rejection of that plan from the Ethics Commission. An advisory opinion from the Ethics Commission, issued upon complete and truthful facts, extinguishes the possibility of proving that a public official who obtained an advisory opinion acted "knowingly and willingly" in violation of the ethics law. Advisory Opinion 97-97 was directed to Robert E. Owens, Jr., Shelby County District Attorney. Fitch, thus, can claim no protection from an advisory opinion issued to the Shelby County District Attorney.
Moreover, Advisory Opinion 97-97 concerns, in part, the bid law. Fitch was found not guilty of violating § 41-16-60, willfully voting to award a contract in which he had a financial interest; thus, any error in the admission of evidence regarding the award of the contract is moot.
Fitch's contention that he was denied a thorough cross-examination of Evans because the trial court refused to allow Fitch to introduce Advisory Opinion 97-97 was not preserved for appellate review; moreover, that advisory opinion was not relevant to Fitch's case.

V.
Fitch contends that the trial court erred by failing to give Fitch's written requested jury instructions concerning public funds, the advisory opinion, the competitive bid law, and theft of property.
"`A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App.1986). When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, *126 ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala.1986).'"
Hemphill v. State, 669 So.2d 1020, 1021 (Ala.Crim.App.1995)(quoting Ward v. State, 610 So.2d 1190, 1194 (Ala.Crim.App.1992)(emphasis omitted)).

V-A.
Fitch argues that the trial court committed reversible error by refusing to give his requested charges, no. 1 and no. 2, concerning public funds. Fitch requested the following charges.
"Defendant's Requested Jury Charge No. 1
"The words public funds distinguish the funds from moneys privately owned. Public funds are those moneys belonging to the State or to any city, county or political subdivision of the State government or the discharge of its obligations. Beckner v. Virginia, 174 Va. 454, 459, 5 S.E.2d 525, 527 (1939)."
C.R. 162.
"Defendant's Requested Jury Charge No. 2
"The character of the money is determined by its ownership rather than by the manner and means of its collection. Beckner v. Virginia, 174 Va. 454, 459, 5 S.E.2d 525, 527 (1939)."
C.R. 163.
Fitch contends that the question whether his alleged financial gain was derived from "public funds" was made an element of proof in several counts in this case by the wording used in the indictments, which charged that Fitch had obtained personal financial gain from "public funds."[21] Thus, he argues he was entitled to have the jury instructed on the definition of public funds.[22] In denying the requested charges, the trial court stated: "If that is the law, any public official with a little imagination could create a strawman, run money through that strawman, a corporation, and that would completely render this statute useless." R. 1199. We agree.
"The Alabama Legislature enacted the state ethics laws to prevent public officials from using their offices to realize private gain." Hipps v. Lauderdale County Bd. of Educ., 631 So.2d 1023, 1027 (Ala.Civ.App.1993). "[T]he Ethics Act itself, in § 36-25-2, enunciates the legislative intent behind the statute.... The tenor of the section read as a whole is that the legislature passed the act to prevent public officials from using their offices to reap private gains." Rampey v. State, 415 So.2d 1184, 1186 (Ala.Crim.App.1982). Thus, the origin of obtained funds is inconsequential to a conviction under § 36-25-5(a), Ala.Code 1975. Proof that personal financial gain was realized from "public funds" is not an element of § 36-25-5(a), nor is it descriptive of the fact or degree of the offense, nor is it material to jurisdiction.
"Unnecessary allegations may be disregarded as surplusage." Smith v. State, 551 So.2d 1161, 1167 (Ala.Crim.App. 1989).
"`"The rule in our State is that an allegation in an indictment which is but mere surplusage may be disregardedit is immaterial for any purpose. The exception *127 to this rule ... is that if the allegation (constituting surplusage) `is descriptive of the fact or degree of the crime, or is material to the jurisdiction' it must be proved as alleged. See McGehee v. State, 52 Ala. 224 [(1875)]." Brown v. State, 30 Ala.App. 339, 343, 7 So.2d 24 (1941) (emphasis in original).'"
Hunt v. State, 659 So.2d 933, 950 (Ala.Crim.App.1994)(quoting McCall v. State, 501 So.2d 496, 507 (Ala.Crim.App. 1986)).
Proof that the origin of Fitch's gain was "public funds" was not an element of the charged offenses. Because the origin of the funds underlying Fitch's alleged direct personal gain is immaterial, the trial court did not err in refusing the requested jury instructions.[23]

V-B.
Fitch argues that the trial court committed reversible error by refusing to give Fitch's requested charges, no. 17, no. 18, and no. 19, concerning the ethics opinion authored by Hugh Raymond Evans III, assistant director and general counsel for the Alabama Ethics Commission. Fitch requested the following charges.
"Defendant's Requested Jury Charge No. 17
"I instruct you that a public official may enter into a contract for public work to be done by a family member; provided, the contract is bid and the family member is the lowest responsible bidder.
"Alabama Ethics Commission, Advisory Opinion No. 97-97."
C.R. 187.
"Defendant's Requested Jury Charge No. 18
"I instruct you that if a family member of a public official is the only bidder after a contract has been sufficiently publicized, the public official may enter into the contract; provided, other bidders were not discouraged from submitting a bid, nor were bids let with the preconceived arrangement that the family member would be the successful bidder.
"Alabama Ethics Commission, Advisory Opinion No. 97-97."
C.R. 188.
"Defendant's Requested Jury Charge No. 19
"I instruct you that a public official is not guilty of using his office for personal gain when he enters into a contract with a family member if: 1) the contract is bid; 2) the contract has been sufficiently publicized; 3) other bidders were not discouraged from submitting a bid; 4) the bids were not let with the preconceived arrangement that the family member would be the successful bidder; and 5) the family member is the lowest responsible bidder.
"Alabama Ethics Commission, Advisory Opinion No. 97-97."
C.R. 189.
Fitch argues that these instructions were warranted because the State injected *128 this issue into the trial when it called Evans for a legal opinion as to an ultimate issue in the case. According to Fitch, these instructions were accurate statements of the law, were based on evidence adduced at trial, and went to the heart of the prosecution's case and the defense's theory.
As discussed in Part IV of this opinion, Advisory Opinion 97-97, which Fitch cites as authority for requested jury charges no. 17, no. 18, and no. 19, was not relevant to Fitch's case. Thus, these instructions were not appropriate.
Additionally, any error in refusing the requested charges would be harmless error[24] and is also moot, because Fitch was found not guilty of violating § 41-16-60, Ala.Code 1975, voting to award a contract in which he had a personal financial gain.
The trial court did not commit error by its refusal to give the requested charges.

V-C.
Fitch argues that the trial court committed reversible error by refusing to give his requested charge, no. 20, concerning the Alabama competitive bid law. Fitch requested the following charge.
"Defendant's Requested Jury Charge No. 20
"I instruct you that the Alabama Competitive Bid Law provides that: `In the event only one bidder responds to the invitation to bid, the awarding authority may reject the bid and negotiate the purchase or contract, providing the negotiated price is lower than the bid price.' The term one bidder means one responsible and qualified bidder.
"Alabama Code, § 41-16-50

"Ericsson GE v. Motorola, 657 So.2d 857 (Ala.1995); White v. McDonald Ford Tractor, Co., 287 Ala. 77, 248 So.2d 121 (1971)."
C.R. 190.
Fitch argues that the instruction was warranted for two reasons. First, Fitch says, the instruction was proper because the State asserted that Fitch used his official office for personal gain by voting on the landfill contract, which under the facts of this case was permitted because the Alabama competitive bid law specifically allows a county commission to negotiate and award a contract to any responsible and qualified bidder, so long as the contract price is lower than the bids. Second, according to Fitch, the requested instruction was due to be given because Fitch was charged with violating the competitive bid law.
Even if the refusal to give the instruction was error, it was harmless error[25] and is now moot, because Fitch was found not guilty of willfully voting to award a contract to Perma Corporation while being financially interested in awarding the contract, a violation of § 41-16-60, Ala.Code 1975, the competitive bid law.

V-D.
Fitch argues that the trial court committed reversible error by refusing to give his requested charges no. 21 and no. 24 concerning theft of property. Fitch requested the following charges be given to the jury.
"Defendant's Requested Jury Charge 21
"I charge you, Ladies and Gentlemen of the Jury, that to sustain the charge of theft of property in the first degree in this case, the State by the evidence must *129 prove beyond a reasonable doubt each of the following elements of the offense:
"1. That Defendant, Jerry Fitch, knowingly obtained, by deception, control over property of Pickens County, Alabama.
"2. That he did so with intent to deprive the said owner of its property; and
"3. That the property was of value exceeding $1,000.00;
"4. That Defendant did not act in the honest belief that he had a claim to the property taken which he was entitled to assert in the manner which forms the basis for the charge against him and, if there is a reasonable doubt from a consideration of all the evidence that the State has failed to prove beyond a reasonable doubt each of the elements of the offense, then you must find the Defendant not guilty.

"Alabama Code § 13A-8-12.

"Wood v. State, 564 So.2d 860, 862-63 (Ala.1990)."
C.R. 191.
"Defendant's Requested Jury Charge No. 24
"I instruct you that in order to find the defendant guilty of theft, the State must prove to you, beyond a reasonable doubt, that the defendant intended to deprive the owner of its property. Even if you find the defendant deceived Pickens County, you may not find him guilty unless the State proves beyond a reasonable doubt that the defendant deprived the county of the value of its contract. If you find that the county was provided the equivalent of the services contracted for, you may not find the defendant guilty of the charges of theft.

"Alabama Code, § 13A-8-2(2).

"Chandler v. State, 615 So.2d 100 (Ala. Crim.App.1992)."
C.R. 193.
"A reversal will not be predicated upon the refusal of a requested charge where the import and intent of the defendant's requested charge is covered in the charge given by the trial court, even though the actual language of the request was not embraced within the court's charge."
Evans v. State, 794 So.2d 415, 438 (Ala. Crim.App.2000).
The trial court instructed the jury as follows regarding theft charged in case no. CC-97-0164.
"Now, count two of case [CC-97-0164] charges theft, first degree, by deception. A person commits the crime of theft of property if he knowingly obtains by deception control over the property of another with the intent to deprive the owner of his property. The theft of property which exceeds $1,000 in value constitutes theft of property in the first degree. Now, in this count, to convict, the State must prove beyond a reasonable doubt each of the following elements of theft of property in the first degree: First, that the defendant, Jerry T. Fitch, Sr., knowingly obtained by deception control over the property of the Pickens County Commission, more specifically, more than $1,000 out of $33,235 deposited to an account owned or partially owned by Jerry T. Fitch, Sr., out of funds expended for closure of the Pickens County Landfill; two, that the property exceeded $1,000 in value; third, that the defendant acted with the intent to deprive the owner of his property. One acts with intent to deprive another of his property when he acts with the purpose of causing that result. And I have already given you the definition *130 as to knowingly. Now, the term `obtains control over property' includes but is not necessarily limited to, the taking, carrying away, or the sale, conveyance or transfer of title to or interest in or possession of property. Now, deception occurs when a person knowingly fails to correct a false impression which the defendant previously had created or confirmed, or fails to correct a false impression when the defendant is under a duty to do so.
"I instruct you that in order to find the defendant guilty of theft, the State must prove to you beyond a reasonable doubt, not only that the defendant deceived Pickens County, but that he also intended to deprive the owner of its property. Deception, unaccompanied by an intent to deprive the owner of its property, is not theft. Now, if you find from the evidence that the State has proved beyond a reasonable doubt each of these elements of the offense of theft of property in the first degree as charged, then you shall find the defendant guilty of theft of property in the first degree. If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of theft of property in the first degree in this count, then you cannot find the defendant guilty of theft of property in the first degree. All right. Those are the two counts in case number [CC-97-0164]."
R. 1252-55.
The trial court instructed the jury as follows regarding theft charged in CC-97-0282.
"Count four is a theft, first degree, by deception. This is case [CC-97-0282]. I've already read the general charge as to the theft by deception. As to this charge, to convict, the State must prove beyond a reasonable doubt each of the following elements of theft of property in the first degree: First, that the defendant Jerry T. Fitch, Sr., knowingly obtained, by deception, control over the property of the Pickens County Commission, more specifically, more than $1,000 out of $30,000 in public funds expended for closure of the Pickens County Landfill; next, that the property exceeded $1,000 in value; next, that the defendant acted with the intent to deprive the owner of its property. One acts with intent to deprive another of his property when he acts with the purpose of causing that result. The term `obtains control over property' includes, but is not necessarily limited to, the taking, carrying away, or the sale, conveyance or transfer of title to or interest in or possession of property. Deception occurs when a person knowingly fails to correct a false impression which the defendant previously has created or confirmed, or fails to correct a false impression when the defendant is under a duty to do so. In order to find the defendant guilty of theft, the State must prove to you beyond a reasonable doubt not only that the defendant deceived Pickens County but that he also intended to deprive the owner of its property. Deception unaccompanied by an intent to deprive the owner of the property is not theft. As to this count, if you find from the evidence that the State has proved beyond a reasonable doubt each of these elements of the offense of theft of property in the first degree as charged, then you shall find the defendant guilty of theft of property in the first degree. If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of theft of property in the first degree, then you cannot find the defendant *131 guilty of theft of property in the first degree."
R. 1260-62.
Regarding requested charge no. 21, the trial court's instruction was similar to the requested charge, and it substantially tracked the language of § 13A-8-3, Ala. Code 1975. Moreover, the trial court instructed the jury that "[d]eception unaccompanied by an intent to deprive the owner of the property, is not theft." Thus, the trial court's instruction was a correct statement of the law, and the import of the instruction regarding intent embraced Fitch's request to charge the jury that actions based on an "honest belief prevent a finding of the element of intent necessary to return a guilty verdict on the theft charge. Thus, the trial court did not err in refusing Fitch's requested jury charge no. 21.
Likewise, regarding requested charge no. 24, the trial court's instruction was similar to the requested charge, and it substantially tracked the language of § 13A-8-3, Ala.Code 1975. Fitch's request to charge the jury that it had to find that "the defendant deprived the county of the value of its contract" in order to reach a finding of guilt was covered by the trial court's instruction that the jury must find that Fitch "intended to deprive the owner of its property" to reach a finding of guilt. Thus, the trial court did not err in refusing requested jury charge no. 24.
For the reasons stated above, the trial court did not err in refusing requested jury charges no. 21 and no. 24.

VI.
Fitch contends that there was insufficient evidence from which the jury could find him guilty of Count two in case no. CC-97-0282. Count two charged the following.
"JERRY T. FITCH SR., ... being a public official or employee, did knowingly and intentionally use his official position or office to obtain direct personal financial gain for himself, to-wit: $6000.00 paid on a loan owed for equipment owned by the said Jerry T. Fitch, Sr., out of $30,000.00 in public funds expended for closure of the Pickens County Landfill, such use and gain not being authorized by law, in violation of Section 36-25-5(a) of the Code of Alabama, as amended."
C.R. 353. At the time of the alleged offense, § 36-25-5(a), Ala.Code 1975, provided:
"No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law."
When reviewing the sufficiency of the evidence to sustain a conviction,
"`"a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Cr.App.1984), aff'd, 471 So.2d 493 (Ala.1985)."'"
Dill v. State, 723 So.2d 787, 796 (Ala.Crim.App.1998)(quoting Burell v. State, 680 So.2d 975, 977 (Ala.Cr.App. 1996), quoting in turn Powe v. State, 597 So.2d 721, 724 (Ala.1992)).
This conviction arises from the first of four payments the Pickens County Commission made to Perma Corporation for work done closing the landfill. This payment to Perma Corporation was made September 28, 1994, in the amount of $134,400. In turn, Perma Corporation paid its subcontractor, Gates Construction, *132 $126,400, which, in turn, paid its subcontractor, Edwards, $66,400, who then paid Bubba $30,000, for work performed closing the landfill. Bubba used $6,000 of the proceeds to pay a bank loan that Fitch had cosigned. The proceeds from the loan were used to purchase a John Deere brand tractor.
On March 14, 1994, Fitch and Bubba obtained a loan, loan number 331881, from First National Bank of Central Alabama, the principal amount being $15,022.40. Fitch cosigned on this loan. The loan stated that it was an "open note" and that security for the loan was Fitch's personal financial statement. State's Exhibit 68. The loan stated that it was a "single advance" with no additional advances contemplated under the note, and, as such, the note did not list any conditions for future advances. State's Exhibit 68. The maturity date of this loan was September 10, 1994. From April through September Bubba made several payments on the loan. It does not appear from the record that Fitch contributed toward payment of the loan during this time.
On September 12, 1994, the day before Perma Corporation was awarded the landfill contract, Bubba executed a loan that on its face purports to be a "renewal of this loan, loan 331881, for the unpaid principal amount of $10,172.96. State's Exhibit 68. The note stated on its face that the purpose of the loan was a "renewal" to purchase equipment. State's Exhibit 69. Fitch did not cosign this loan. The "renewed" loan states that it was an "open note" and that the security was Bubba's "deposit accounts and other rights to the payment of money from you." State's Exhibit 69. The renewal was given a new loan number, 332511.
Ultimately, Bubba made a $6,000 payment on the renewed loan from money he was paid for his work closing the landfill. This money originated as a payment from the Pickens County Commission to Perma Corporation for work on the landfill closure. This payment underlies Fitch's conviction for the charge recited above. According to Fitch, because Bubba renewed the original loan in Bubba's name only, Fitch was no longer obligated under the original loan and therefore could not be guilty of obtaining direct financial gain by Bubba's payment toward paying off the renewed loan.
According to Fitch, no evidence was presented at trial indicating that Fitch owned the tractor; thus, he says, there was no evidence that Fitch derived financial gain by Bubba's loan payment. The evidence, according to Fitch, was that Bubba had obtained the loan, and, moreover, that Bubba owned the tractor; thus, Fitch had obtained no direct financial gain from the loan payment. The question is not one of "ownership" as argued by Fitch, but rather indebtednesswho was legally obligated to repay the bank loan? Thus, the dispositive question becomes whether Fitch, who cosigned on Bubba's original loan, remained liable to the bank after the loan was renewed by Bubba.
Tom Clemmons, vice president and loan officer at First National Bank of Central Alabama, Carrollton office, testified on cross-examination that the proceeds from the second loan, loan 332511, in addition to Bubba's payroll checks from Livingston Stockyard ($692.30) and Justles Oil Company ($275.95) were used to pay off the original note, note 331881. The inference to be derived from this testimony is that the original loan, loan 331881, was paid in full, and that Fitch's liability under loan 331881 terminated. However, Clemmons testified on redirect examination by the State that the original loan, number 331881, was never "closed." According to Clemmons, the renewal did not terminate *133 Fitch's responsibility under the original loan. Clemmons testified:
"When someone signs a note and is obligated on that note, until it's paid off, even though it's renewed, or renewed by somebody else ... it's ... within the legal discretion of the bank to go after whoever signed the first note."
R. 662.
"Whether the execution of a note is a renewal of or payment for a previous note is a matter of the intention of the parties." First State Bank of Franklin County v. Ford, 484 So.2d 407, 409 (Ala.1986), citing Martin v. First National Bank of Opelika, 279 Ala. 303, 310, 184 So.2d 815, 821 (1966). On its face the second loan, loan 332511, states in two places that it is a renewal of the first loan, loan 331881. "Loan Number 332511 ... Renewal of 331881." State's Exhibit 69. "The Purpose Of This Loan is Consumer: Renewal (Purchase Equipment)." State's Exhibit 69. Because the evidence indicates that the second loan was intended by the parties to be a renewal of the first loan, Fitch remained liable to the bank for payment of the second loan obtained by Bubba, even though Fitch did not execute a form indicating he was cosigning for the loan. Thus, there was sufficient evidence from which the jury could find Fitch guilty of realizing direct financial gain from his position as a county commissioner.

VII.
Fitch contends that there was insufficient evidence to prove that he obtained "public funds." Fitch was charged with obtaining "public funds" in Counts one, two, and four of case no. CC-97-0282; Counts two, three, and four of case no. CC-97-0155; and Count one of case no. CC-97-0164. According to Fitch, once the State charged him with obtaining "public funds," it was required to prove its charge. Fitch asserts that whether he allegedly obtained "public funds" is a question of first impression in Alabama. Fitch argues that the State never proved that he obtained "public funds." Fitch also contends that this constitutes a fatal variance between the allegation in the indictment and the proof at trial. He compared the situation to reversals in situations where a defendant is indicted for theft of a check but the proof at trial is theft of money, and notes that we have reversed convictions in such cases. State v. Saxton, 724 So.2d 77 (Ala.Crim.App.1998).
As discussed in Part V-A above, "public funds" was not an element of the crime defined in § 36-25-5(a), Ala.Code 1975, and proof thereof was not necessary to a conviction. In 1995, § 36-25-5(a), Ala.Code 1975, prohibited a public official or employee from using his or her "official position or office to obtain direct personal financial gain for himself, or his family, or any business." The personal financial gain did not have to be derived from public funds. "`A variance between the indictment and the proof is immaterial when the alleged variance may be treated as surplusage.'" Irby v. State, 615 So.2d 1262, 1264 (Ala.Crim.App.1992)(quoting Dailey v. State, 374 So.2d 414, 417 (Ala.Crim.App. 1979)).
Moreover, there was no variance between the charge in the indictment and the proof presented at trial.
"`The policy behind the variance rule is that the accused should have sufficient notice to enable him to defend himself at trial on the crime for which he has been indicted and proof of a different crime or the same crime under a different set of facts deprives him of that notice to which he is constitutionally entitled.' House, 380 So.2d at 942. `Not every variance is fatal. Berger v. United *134 States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Reviewing a claim of variance requires use of a two step analysis: (1) was there in fact a variance between the indictment and proof, and (2) was the variance prejudicial.' United States v. McCrary, 699 F.2d 1308, 1310 (11th Cir.1983). `The true inquiry, therefore, is not whether there has been a variance in proof, but whether there has been such a variance "as to affect the substantial rights" of the accused.' Berger, 295 U.S. at 82, 55 S.Ct. at 630. `Variance from the indictment is not always prejudicial nor is prejudice assumed.' United States v. Womack, 654 F.2d 1034, 1041 (5th Cir.1981), cert. denied, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314(1982). The determination of whether a variance affects the defense will have to be made based upon the facts of each case. United States v. Pearson, 667 F.2d 12, 15 (5th Cir.1982)."
Smith v. State, 551 So.2d 1161, 1168-69 (Ala.Crim.App.1989); Hunt v. State, 659 So.2d 933, 950 (Ala.Crim.App.1994), aff'd, 659 So.2d 960 (Ala.1995)(classification of offense as a felony, while erroneous, was mere surplusage); Pardue v. State, 571 So.2d 320, 328 (Ala.Crim.App.1989)(value of stolen pistol, though alleged in the indictment, was surplusage and did not have to be proven), rev'd on other grounds, 571 So.2d 333 (Ala.1990); Lunceford v. City of Northport, 555 So.2d 246 (Ala.Crim.App. 1988) (because the location of alleged DUI offense was not a material allegation, proof of the correct location of the driving did not constitute a material variance); Johnson v. State, 405 So.2d 149, 151 (Ala.Crim.App.1981)(language "intent to promote or assist the commission of" in indictment was surplusage); Cauley v. State, 14 Ala.App. 133, 135, 72 So. 271, 272 (1916)(the allegation in the indictment asserting the value of stolen cow was not descriptive of the offense, was properly regarded as surplusage, and proof thereof was not necessary).
Moreover, the proof followed the allegations in the indictments. Here, the State proved that the money Fitch had obtained originated from payments made by the Pickens County Commission to the contractor closing the landfill. The funds were derived from the taxpayers of Pickens County. "Laundering" the money through several contractors does not erase the crime.[26] Thus, there was no variance between the indictment and the proof.

*135 VIII-A.
Fitch contends that there was insufficient evidence presented to convict him of using his position or office for direct financial gain. The testimony at trial indicated that Fitch did not lobby the commissioners to vote on the contract or to get business for himself, Edwards, or Bubba. Thus, according to Fitch, even assuming that he obtained personal financial gain from the transactions concerning the landfill, there was no evidence that this gain had been obtained by the use of his office or position. Thus, he says, each conviction under § 36-25-5(a), Ala.Code 1975, is due to be reversed and judgment rendered in his favor based on insufficient evidence. Moreover, in support of this claim Fitch argues that by returning a not-guilty verdict in Count one of case no. CC-97-0155, which charged Fitch with violating § 41-16-60, Ala.Code 1975, the jury found that Fitch did not have a personal interest in awarding the contract to Gates Construction when he voted to do so. According to Fitch, because the jury found that he did not have a personal interest in awarding the landfill contract, it could not find that he used his position or office for direct financial gain in violation of the ethics law.
Although there was no direct evidence of Fitch's "using" his position or office for direct financial gain, that term is not limited to active lobbying or to pressuring commissioners to give him business. This element will most often be established by circumstantial evidence.
"`"`"`In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir.1974); United States v. McGlamory, 441 F.2d 130 (5th Cir. 1971); Clark v. United States, 293 F.2d 445 (5th Cir.1961).
"`"`"`[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir. *136 1969); Roberts v. United States, 416 F.2d 1216 (5th Cir.1969)....
"`"`....
"`"`In determining the sufficiency of the evidence to sustain the conviction, this court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Faircloth, 471 So.2d 493 (Ala.1985)."'"
Langham v. State, 662 So.2d 1201, 1205-06 (Ala.Crim.App.1994) (emphasis omitted).
The circumstantial evidence suggesting that Fitch used his position for direct personal gain includes the fact that Fitch stated that he would not allow his County employees, i.e., Edwards, to work on the landfill. He stated that his employees could not be spared from their County road-work duties. Only Fitch had the authority to grant District 4 employees leave. However, contrary to earlier comments, Fitch granted Edwards a leave of absence from his job with the County just two days before Eupora submitted a successful bid obtaining the contract to close the landfill. Because Fitch did receive personal financial gain from Edwards working at the landfill, Fitch clearly used his position for direct financial gain.
Moreover, there was testimony that Edwards used a piece of County equipment called a sheep-footed roller to close the landfill. The jury could infer that Fitch was aware of this because there was testimony from at least one witness that Fitch was at the site most days.
Additionally, Fitch made incriminating comments before awarding and after awarding the contract. There was testimony that Fitch expressed an interest in getting the landfill contract himself when he stated "`I wish that I wasn't involved,' that [he] would like to have the contract." R. 880. There was also testimony that Fitch commented that "[Commissioner Latham] was just mad because [Fitch] had friends that could get things done." R. 934. The implication was that Fitch had arranged for his "friends" to do the work.
There was sufficient circumstantial evidence to support submitting the case to the jury. Moreover, this Court cannot reach "a clear conclusion that the finding and judgment are wrong." Williams v. State, 795 So.2d 753, 774 (Ala.Crim.App. 2000), aff'd, 795 So.2d 785 (Ala.2001)(quoting White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989), quoting in turn, Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962)). Therefore, the trial court did not err in denying Fitch's challenge to the sufficiency of the evidence made at the conclusion of the State's case and at the end of all the evidence.

VIII-B.
In addition to his initial argument of insufficient evidence, and in direct response to the State's argument in its brief, Fitch argues in his reply brief that an acquittal under § 41-16-60, Ala.Code 1975 (a county commissioner cannot award a contract in which he has an interest), prevents any convictions under § 36-25-5(a) (use of office to obtain financial gain) because these statutes are mutually exclusive, i.e., if the jury found that Fitch did not award a contract in which he had an interest, it could not find that he used his office to obtain financial gain.
"`The general rule is that consistency between the verdicts on the separate counts of a multicount indictment is not required.' Moss v. State, 536 So.2d 129, 136 (Ala.Cr.App.1988).
"`A defendant convicted by a jury on one count cannot attack that conviction *137 on the ground that it is inconsistent with the jury's verdict of acquittal on another count. Dunn v. United States, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932).
"`"The general rule is that there need be no rational compatibility or consistency between the verdicts on the several counts of an indictment. The exception to this rule is where the jury returns multiple convictions as to crimes which are mutually exclusive of each other. Conway v. State, 489 So.2d 641, 642 (Ala.Cr.App.1986) (Verdicts of not guilty by kidnapping and guilty of felony-murder were mutually exclusive. Verdicts of not guilty of intentional murder but guilty of manslaughter and guilty of felony-murder were not mutually exclusive.). See also Smelcher v. State, 520 So.2d 229, 232 (Ala.Cr.App.1987) (verdicts of guilty of rape but not guilty of sodomy [when victim testified that defendant raped and sodomized her] not inconsistent); Oden v. State, 41 Ala.App. 212, 215, 127 So.2d 380 (1961) (`On review we cannot treat the two counts as charging an indivisible crime or even yoked offenses.' No error found because a conviction for making or distilling alcoholic liquors and acquittal for possession of a still)."'

"Grikis v. State, 552 So.2d 187 (Ala.Cr. App.1989) (brackets added)."
Lackey v. State, 615 So.2d 145, 156 (Ala.Crim.App.1992)(quoting Inmon v. State, 585 So.2d 261, 268 (Ala.Crim.App. 1991)).
At the time of the offense, § 41-16-60 stated:
"No member or officer of ... the county commissions ... shall be financially interested or have any personal beneficial interest, either directly or indirectly, in the purchase of or contract for any personal property or contractual service, nor shall any person willfully make any purchase or award any contract in violation of the provisions of this article."
In 1994, § 36-25-5(a) stated:
"No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law."
Sections 41-16-60 and 36-25-5(a) are not mutually exclusive. Section 41-16-60 governs the bidding procedures for awarding public contracts. Section 60 of chapter 16 concerns "conflicts of interest of members or officers of governing bodies or instrumentalities of counties, municipalities and certain state and local institutions generally" and the "making of purchases or awarding of contracts in violation of article." § 41-16-60, Ala.Code 1975. Regarding competitive-bid practices, "the intent of the legislature was to prevent a conflict of interests so that no member of a governing board would endeavor to give favorable treatment to businesses in which he would be financially or beneficially interested in connection with purchases of personal property or a contractual service." City of Montgomery v. Brendle Fire Equipment, Inc., 291 Ala. 216, 222, 279 So.2d 480, 486 (Ala.1973).
The ethics law is much broader than the competitive bid law.
"`The tenor of the section [36-25-2] read as a whole is that the legislature passed the act to prevent public officials from using their offices to reap private gains. The "conflicts of interests" referred to in the section are conflicts between an official's private interests and his official duties. Muncaster v. *138 Alabama State Ethics Commission, 372 So.2d 853 (Ala.1979).'"
Kirkland v. State, 529 So.2d 1036, 1040 (Ala.Crim.App.1988)(quoting Rampey v. State, 415 So.2d 1184, 1186 (Ala.Crim.App. 1982)).
Whether Fitch voted to award the contract to an entity that would return personal gain to him is a separate issue from the issue whether he, in his official position, knowingly and willingly obtained direct personal financial gain for himself, his family, or business unless specifically authorized by law. Section 36-25-5(a) prohibited Fitch from deriving personal financial gain from his position as a commissioner, regardless of whether he voted to award the contract. The jury may have determined that Fitch formed the intent to use his office for gain after the vote. Intent may be formed at any time. See Samuels v. State, 504 So.2d 367, 370 (Ala.Crim.App.1987)(intent could have been formed after accused grasped the knife).
Thus, there was sufficient evidence presented indicating that Fitch had used his official position or office for personal gain to support the conviction.

IX.
Fitch contends that there was insufficient evidence presented from which the jury could find him guilty of aiding and abetting Harry Edwards in the use of his position or office for direct financial gain.
Fitch was charged in Count five of case no. CC-97-0155 with the following.
"JERRY T. FITCH, SR., ... with intent to promote or assist the commission of the offense, did aid or abet Harry Gene Edwards, a public official or employee, in committing the offense of knowingly and intentionally using his official position or office to obtain direct personal financial gain for himself, in violation of Section 36-25-5(a) of the Code of Alabama, as amended, against the peace and dignity of the State of Alabama."
C.R. 3.
This count does not charge that Fitch used his office for Edwards's direct personal financial gain, but charges that Edwards used his position or office for Edwards's direct personal gain. Fitch argues that no evidence was produced at trial tending to prove that Edwards used his position for direct personal financial gain, i.e., that Edwards had committed an ethics violation. Thus, according to Fitch, there was no proof of a crime as to which Fitch could aid and abet. According to Fitch, the essence of the offense in § 36-25-5(a), Ala.Code 1975, is an abuse of power. Breland v. Ford, 693 So.2d 393, 406 (Ala.1997). Fitch asserts that Edwards did not have any power to abuse, and, therefore, that he did not violate this statute.
In 1994, § 36-25-5(a) provided:
"No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law."
(Emphasis added.)
In 1994, § 36-25-1(9), Ala.Code 1975, defined public employee as:
"Any person employed at the state, county or municipal level of government or their instrumentalities who is paid in whole or in part from state, county or municipal funds."
"`In a challenge of the sufficiency of the evidence, an appellate court must consider the evidence in the light most favorable to the prosecution, and the appellate *139 court will not substitute its judgment for that of the trier of fact.'" Gamble v. State, 791 So.2d 409, 443 (Ala.Crim.App.2000)(quoting Maddox v. State, 620 So.2d 132, 133 (Ala.Crim.App. 1993)).
"Section 13A-2-23, Ala.Code 1975, Alabama's accomplice-liability statute, provides, in pertinent part:
"`A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
"`....
"`(2) He aids or abets such other person in committing the offense....'"
Gamble v. State, 791 So.2d 409, 443 (Ala. Crim.App.2000).
"Aid and abet comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary." Turner v. State, 674 So.2d 1371, 1376 (Ala.Crim.App. 1995) (citations omitted). "`The participation in a crime and the community of purpose of the perpetrators need not be proved by direct or positive testimony, but may be inferred from circumstantial evidence.'" Limbaugh v. State, 581 So.2d 5, 10 (Ala.Crim.App.1991), quoting Tice v. State, 460 So.2d 273, 279 (Ala.Crim.App. 1984). Fitch's intent was "an issue for the jury to resolve." Waldrop v. State, [Ms. CR-98-2316, December 1, 2000] ___ So.2d ___,___.
There is sufficient evidence that Edwards violated the ethics law. There is no dispute that before taking a leave of absence, Edwards was employed by the Pickens County Commission as a foreman for District 4 and that he took a leave of absence from this job to work as an independent contractor on the landfill closure. His position with the County comes within the definition of public employee and subjected him to the ethics law. Instead of allowing Edwards to work at the landfill for the County as a County employee, Fitch helped Edwards, through Eupora, to formulate a bid to submit for the landfill project by meeting with Edwards and Koehn at the landfill. Fitch then granted his business partner, Edwards, a leave of absence from his $8.00 per hour job with the County to work on the landfill closure for significantly higher wages as a private-contract employee. Edwards could not have received a leave of absence without Fitch's approval. Edwards then paid Fitch's son, Bubba, approximately $30,000 to work at the landfill. From this payment Bubba and Fitch obtained cash and Bubba paid debts for which he and Fitch were liable. When the landfill closure was completed, Edwards returned to his job with the county.
These facts create an inference of collusion between Fitch and Edwards that supports the jury's finding that as a public employee, Edwards violated the ethics law. There was sufficient circumstantial evidence from which the jury could find Fitch guilty of aiding and abetting Harry Edwards in the use of his position or office for direct financial gain.

X.
Fitch contends that the trial court erred by denying his challenge for cause to a veniremember who stated that she was the assistant prosecutor's third cousin.
"THE COURT: Mrs. [M.]let's bring this up. Mrs. [M.] had said that she was kin to [C.M.], the assistant district attorney. I don't know if we were on the record a minute ago or not but the Defendant has moved to strike on that basis.

*140 "MR. BAXLEY [Defense counsel]: Yes, sir. We would say that she is a cousin to the Assistant D.A., ..., who is prosecuting the case and we think that would be a strike for cause.
"THE COURT: Denied. Who else was it?"
R. 303.
The decision of the trial court on challenges for cause will not be disturbed on appeal unless "clearly erroneous, equivalent to an abuse of discretion." Baker v. State, [Ms. CR-95-0292, January 12, 2001] ___ So.2d ___, ___ (Ala.Crim.App.2001)
"That a juror is related to the district attorney or to the prosecuting attorney is no ground for challenge for cause." Howard v. State, 420 So.2d 828, 831 (Ala.Crim.App.1982). "The party seeking to challenge a juror for cause must show that the questioned juror [was] due to be struck under § 12-16-150, Code of Alabama 1975, or on common law grounds." Smith v. State, 581 So.2d 497, 503 (Ala.Crim.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991). No response from this juror suggested that this juror could not "disregard her relationship with Assistant District Attorney and to render a fair and impartial verdict." Whitehead v. State, 777 So.2d 781, 811 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000). "Where statutory grounds for juror qualifications are not involved, the trial judge is given much discretion in attempting to insure an unbiased jury." Nettles v. State, 435 So.2d 146, 150 (Ala. Crim.App.1983)("That this same juror was the third cousin of Sergeant Mayo, the arresting officer and main witness for the prosecution, did not constitute a statutory ground of challenge for cause."). There is no indication in the record that the trial court abused its discretion.

XI.
Fitch contends that the cumulative effect of the errors at trial entitle him to a new trial. We disagree.
"`"Because we find no error in the specific instances alleged by the appellant, we find no cumulative error. `Where no single instance of alleged improper conduct constituted reversible error, we do not consider their cumulative effect to be any greater.' (citations omitted)."'"
Evans v. State, 794 So.2d 415, 440 (Ala.Crim.App.2000)(quoting Chandler v. State, 615 So.2d 100, 110 (Ala.Crim.App. 1992)).

Conclusion
This is a difficult case. There was ample evidence that because of impending severe economic penalties, Pickens County and its citizens would suffer if the landfill was not closed. Nevertheless, the ethics law prohibits elected officials and public employees, and their relatives, from obtaining direct personal financial gain for themselves, their family, or any business with which they or a member of their family is associated. § 36-25-5(a), Ala. Code 1975.
Perhaps Commissioner Fitch would have had a stronger defense regarding lack of intent if he had "laid all his cards on the table" by explaining his involvement to the commission on the record minutes of the commission meetings. Or if he had sought an advisory opinion and followed it accordingly. "The written opinion of the state ethics commission provided to anyone shall protect such person to whom it is directed from liability to [the state] ... because of any official action or actions performed as directed or advised in such opinion." Dill v. State, 723 So.2d at 803; see § 36-25-4(9), Ala.Code 1975 (before that statute was amended, effective October 1, 1995); *141 see § 36-25-4(9), Ala.Code 1975 (as amended, effective October 1, 1995). The ethics law does not provide exceptions or provide latitude to "concerned" elected officials who foresee impending hardships on the public entity.
In the final analysis, the legislative intent is clear in its passage of the ethics law. In 1995, the ethics statute stated the following regarding the statute's intent:
"It is essential to the proper operation of democratic government that public officials be independent and impartial; that governmental decisions and policy be made in the proper channels of the governmental structure; that public office not be used for private gain other than the remuneration provided by law; and that there be public confidence in the integrity of government. The attainment of one or more of these ends is impaired whenever there exists a conflict of interest between the private interests of an elected official or a government employee and the duties as such. The public interest, therefore, requires that the law protect against such conflicts of interest and establish appropriate ethical standards with respect to the conduct of elected officials and government employees in situations where conflicts exist."
§ 36-25-2, Ala.Code 1975. This intent was unchanged by the 1995 amendment.
Fitch had the benefit of outstanding trial and appellate counsel, but the ability of defense counsel cannot change the law or the facts. Fitch and a member of his family enjoyed substantial personal gain while Fitch held a position of public trust. Had Fitch truly wanted to save Pickens County taxpayer's money, he would have allowed Edwards work at the landfill for the County at his hourly pay. Consequently, Fitch's convictions are affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB and SHAW, JJ., concur; WISE, J., concurs in the result.
NOTES
[1] The significant delay between the date of Fitch's conviction and the date of the issuance of this opinion was due to the necessity of resolving whether Fitch's appeal was properly before this court. Fitch was convicted on January 17, 1998. On direct appeal, we remanded the case to the circuit court for that court to determine whether Fitch's notice of appeal was timely. On October 20, 1998, this Court held that Fitch's appeal was timely filed. The State, after its application for rehearing was denied, petitioned the Alabama Supreme Court for certiorari review. On April 15, 1999, the Court of Criminal Appeals stayed Fitch's direct appeal until the Alabama Supreme Court ruled on Fitch's petition for certiorari review. On April 14, 2000, certiorari review was denied. On May 8, 2000, Fitch's direct appeal was assigned to Judge Fry, who recused himself. On May 9, 2000, Fitch's direct appeal was reassigned to Judge Cobb.
[2] The Pickens County Commission operates on a district system. Under a district system, each district within the county was autonomous and maintained its own employees and equipment.
[3] Koehn stated that he visited the landfill about six weeks before starting the job, which would have been July 1994.
[4] Koehn stated that he did not have any contact with Ken Gates, the owner of Gates Construction Company, before starting work at the landfill and did not meet Gates until a day or so after starting the job.
[5] Edwards was granted a leave of absence from his county job for the period between August 29, 1994, through November 4, 1994.
[6] All county employees received a 50 cent raise beginning with the first pay period in October; thus, Edwards would have begun earning $8.25 per hour at that time.
[7] This bid was $120,750 less than RaCon, the only other eligible bid.
[8] At an October commission meeting, the commissioners voted to transfer money for the costs of covering the landfill from the Hospital Health Sales Tax Fund to the Solid Waste Fund. The Hospital Health Sales Tax Fund is a tax received from the State collected from the citizens of Pickens County. The fund was intended to help with health-related projects in Pickens County. The Solid Waste Fund is the operating fund for the landfill and the solid waste facility in Pickens County.
[9] This payment to Bubba was designated a payment for equipment rented.
[10] Count two of case no. CC-97-0155 charged:

"JERRY T. FITCH, SR., ... being a public official or employee, did knowingly and intentionally use his official position or office to obtain direct personal financial gain for Jerry T. `Bubba' Fitch, Jr., a member of Jerry T. Fitch, Sr.'s family, to-wit: $30,000.00 paid to the said Jerry T. `Bubba' Fitch, Jr., out of public funds expended for closure of the Pickens County Landfill, such use and gain not being specifically authorized by law, in violation of Section 36-25-5(a) of the Code of Alabama as amended."
[11] Count one of case no. CC-97-0282 charged:

"JERRY T. FITCH, SR., ... being a public official or employee, did knowingly and intentionally use his official position or office to obtain direct personal financial gain for himself, to-wit: $15,035.06 paid on a loan owed by the said Jerry T. Fitch, Sr., out of $30,000.00 in public funds expended for closure of the Pickens County Landfill, such use and gain not being authorized by law, in violation of Section 36-25-5(a) of the Code of Alabama as amended."
[12] Count two of case no. CC-97-0282 charged:

"JERRY T. FITCH, SR., ... being a public official or employee, did knowingly and intentionally use his official position or office to obtain direct personal financial gain for himself, to-wit: $6,000.00 paid on a loan owed for equipment owned by the said Jerry T. Fitch, Sr., out of $30,000.00 in public funds expended for closure of the Pickens County Landfill, such use and gain not being authorized by law, in violation of Section 36-25-5(a) of the Code of Alabama as amended."
[13] Count 3 of case no. CC-97-0155 charged:

"JERRY T. FITCH, SR., ... being a public official or employee, did knowingly and intentionally use his official position or office to obtain direct personal financial gain for Jerry T. "Bubba" Fitch, Jr., a member of Jerry T. Fitch, Sr.'s family, to-wit: $33,235.00 paid to the said Jerry T. "Bubba" Fitch, Jr., out of public funds expended for closure of the Pickens County Landfill, such use and gain not being authorized by law, in violation of Section 36-25-5(a) of the Code of Alabama as amended...."
[14] Count one of case no. CC-97-0164 charged:

"JERRY T. FITCH, SR., ... being a public official or employee, did knowingly and intentionally use his official position or office to obtain direct personal financial gain for himself, to-wit: more than $1,000.00 out of $33,235.00 deposited to an account owned or partially owned by Jerry T. Fitch, Sr., out of public funds expended for closure of the Pickens County Landfill, such use and gain not being authorized by law, in violation of Section 36-25-5(a) of the Code of Alabama as amended...."
[15] Count four of case no. CC-97-0155 charged:

"JERRY T. FITCH, SR., ... being a public official or employee, did knowingly and intentionally use his official position or office to obtain direct personal financial gain for Jerry T. `Bubba' Fitch, Jr., a member of Jerry T. Fitch Sr.'s family, to-wit: $8546.63 paid to the said Jerry T. `Bubba' Fitch, Jr., out of public funds expended for closure of the Pickens County Landfill, such use and gain not being authorized by law, in violation of Section 36-25-5(a) of the Code of Alabama as amended...."
[16] "Alabama adopted its first Ethics Law, Act. No. 1056," in 1973. James L. Sumner, Jr., The Alabama Ethics Law: A Retrospective, 60 Ala. Law. 264, 264 (1999). "[T]he Ethics Law had been revised several timesmost significantly in 1995." Id. "The amendments ... clarified and expanded the requirements and duties of candidates who run for office, public officials, lobbyists, and public employees." Survey of 1995 Alabama Legislation, 47 Ala. L.Rev. 645, 700 (1996). The most recent amendment to § 36-25-5(a) was October 1, 1995. The amendment broadened the former § 36-25-5(a). As amended, § 36-25-5(a)

"prohibits a public official, public employee, or family member from `convert(ing) to personal use (an) object constituting ... personal gain' or `caus(ing) to be used equipment, facilities, time materials, human labor, or other public property ... for private benefit or business benefit' of the person. The amended section further prohibits all persons from soliciting a thing of value from a public official or public employee for financial gain and prohibits an official or employee from doing the same from either a subordinate or a business supervised by that official."
Survey of 1995 Alabama Legislation, 47 Ala. L.Rev. 645, 702-03 (1996).
[17] "`"`After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was.... In order for a constitutional error to be deemed harmless under Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)], the state must prove beyond a reasonable doubt that the error did not contribute to the verdict and/or sentence.... In order for the error to be deemed harmless under Ala. R.App.P. 45, the state must establish that the error did not or probably did not injuriously affect the appellant's substantial rights.... The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing.'"'"

McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ___, ___ (Ala.Crim.App.2000)(quoting Davis v. State, 718 So.2d 1148, 1164 (Ala.Crim.App.1997)).
[18] At the conclusion of the instruction, defense counsel pointed out to the trial court, and the trial court agreed, that the trial court had incorrectly instructed the jury that the State's burden of proof had to be met to the jury's satisfaction instead of the correct standard of beyond a reasonable doubt. Without objection, the trial court stated that the mistake would be corrected during the trial court's jury charge, and it was.
[19] If the objection and answer were simultaneous, as argued in Fitch's reply brief, defense withdrew his objection when he stated: "Well, let him answer it." R. 765.
[20] In CC-97-0282, Fitch was charged in Count four with "knowingly obtain[ing], by deception, control over more than $1000.00 out of $30,000.00 in public funds expended for closure of the Pickens County Landfill, the property of the Pickens County Commission, with the intent to deprive the owner of the said property, in violation of Section 13A-8-3 of the Code of Alabama."

In CC-97-0164, Fitch was charged in Count two with "knowingly obtain[ing], by deception, control over more than $1000.00 out of $33,235.00 deposited to an account owned or partially owned by Jerry T. Fitch, Sr., out of funds expended for closure of the Pickens County Landfill, the property of the Pickens County Commission, with the intent to deprive the owner of said property, in violation of Section 13A-8-3, of the Code of Alabama...."
[21] Count one of CC-97-164; counts two, three, and four of CC-97-155; and counts one, two, three, and four of CC-97-282.
[22] We note that neither the original statute nor the amended statute provides a definition of "public funds."
[23] We note that the State did prove that the funds originated as "public funds." The testimony at trial was that the money for covering the landfill was derived from the Pickens County Hospital Health Sales Tax Fund. The Hospital Health Sales Tax Fund is a tax received from the State that was collected from the citizens of Pickens County. The fund was intended to help with health-related projects in Pickens County. The Pickens County Commission voted to transfer money out of the Hospital Health Sales Tax Fund to pay the costs of closing the landfill. Laundering the funds through contractors and subcontractors does not negate the fact that the funds were public funds.
[24] McGriff, supra.
[25] McGriff, supra.
[26] Fitch relies on Beckner v. Commonwealth, 174 Va. 454, 5 S.E.2d 525 (1939), in support of his claim that the money he allegedly obtained was not "public funds." In Beckner, the question was "whether moneys collected by the constable, upon execution against judgment debtors and held to credit of judgment creditors, are public funds or moneys, where there is no evidence that any of the moneys alleged to have been misused, misapplied or embezzled were funds belonging to the State or any subdivision thereof." Beckner, 174 Va. at 458, 5 S.E.2d at 526. There is no statute in Virginia defining public moneys. Fitch relies on the definition attributed to public moneys by the Virginia Court to support his claim that he did not obtain public funds and therefor, he is not guilty as charged in the indictments. The Virginia court stated the following regarding public funds:

"The words `public moneys' distinguish the funds from moneys privately owned. Public funds are those moneys belonging to the State or to any city, county or political subdivision of the State,or more specifically, taxes, customs and moneys raised by the operation of law for the support of the government or for the discharge of its obligations."
Beckner, 174 Va. at 459, 5 S.E.2d at 527.
The Virginia Court reversed Beckner's conviction because the Commonwealth failed to prove that Beckner had obtained public funds for his personal use. The court found that,
"Money in the hands of a constable, collected under execution awaiting distribution to private owners, does not belong to the public. It represents funds held in trust for individual litigants, and not for the State or its political subdivisions. The character of the money is determined by its ownership rather than by the manner and means of its collection."
Beckner, 174 Va. at 459, 5 S.E.2d at 527.
Fitch argues that because the character of money is determined by ownership, when the Pickens County paid Perma Corporation, the funds ceased to be public funds. Moreover, according to Fitch, the funds were removed from Pickens County five times before Fitch received any money; thus, Fitch says, the money he received was not public money. Even if the character of money is determined by ownership, laundering money, as here, does not change the money's character.
Moreover, Beckner is distinguishable from Fitch's case because the "owners" of the money in Beckner were the individual judgment creditors. The money in Beckner was not collected for the State, it never belonged to the State. The constable collected the judgment on behalf of the creditors pursuant to a court order. The court order was the mechanism used by creditors to collect money owed to them. The collected money was distributed to the creditors upon whose behalf it was collected. The money in Fitch's case was derived from taxes assessed upon the citizens of Pickens County to be used by the County to pay County expenses. Thus, Pickens County "owned" the money. That the money was laundered through several entities before it was obtained by Fitch did not extinguish the fact that it originated from the citizens of Pickens County.